**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| FOCUS FINANCIAL PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0188-JTL |
| | ) | |
| SCOTT HOLSOPPLE, and HIGHTOWER HOLDINGS, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

Date Submitted: October 7, 2020
Date Decided: November 2, 2020

Travis S. Hunter, Dorronda R. Bordley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael V. Rella, MURPHY & McGONIGLE, New York, New York; *Attorneys for Plaintiff*.

Daniel M. Silver, Travis J. Ferguson, Alexandra M. Joyce, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Defendants*.

**LASTER, V.C.**

Focus Financial Partners, LLC ("Focus Parent") is the publicly traded parent company of Focus Operating, LLC ("Focus Sub"). Scott Holsopple left his employment with Focus Sub and took a job with Hightower Holdings, LLC ("Hightower").

Focus Parent filed this lawsuit against Holsopple and Hightower. In a previous decision, this court dismissed Holsopple from the case for lack of personal jurisdiction. *Focus Fin. P'rs, LLC, v. Holsopple* (*Jurisdiction Decision*), --- A.3d ---, 2020 WL 6266915 (Del. Ch. Oct. 26, 2020). Hightower has moved separately to dismiss this action under Rule 12(b)(3) based on the doctrine of *forum non conveniens*. This decision grants that motion.[1]

## I. FACTUAL BACKGROUND

The facts for purposes of Hightower's motion to dismiss under Rule 12(b)(3) are drawn from the currently operative complaint, the documents it incorporates by reference, and other filings on the docket. At this stage of the case, the court views the record in the light most favorable to the plaintiff.

### A. Focus Parent and Focus Sub

Focus Parent is a holding company that owns all of the member interests in Focus Sub. Both are organized as Delaware limited liability companies. Both have their principal places of business in New York, New York.

---

[1] Hightower also moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim on which relief could be granted. The outcome of this decision makes it unnecessary to reach that motion.

Focus Sub conducts business in the wealth management industry. As part of its business model, Focus Sub invests in and provides services to investment advisors in the United States, Canada, the United Kingdom, and Australia. Focus Sub has offices in New York and San Francisco.

**B.      Holsopple Joins Focus Sub.**

Holsopple joined Focus Sub by accepting an offer letter dated December 12, 2014. According to the offer letter, New York law governed the terms of his employment.

The offer letter stated that Holsopple would be "based in [Focus Sub's] San Francisco, CA office." Dkt. 22 Ex. 1. It promised him an annual salary of $220,000 plus a performance bonus payable in cash or units of Focus Parent. As a signing bonus, the offer letter promised Holsopple $75,000 in cash plus 40,000 units in Focus Parent.

Holsopple's receipt of the 40,000 units was "subject to, and conditioned upon" his entry into a "standard Incentive Unit Agreement" with Focus Parent. *Id.* Holsopple executed the agreement on January 15, 2015. Dkt 49 Ex. 1 (the "2015 Unit Agreement").

The 2015 Unit Agreement defined Holsopple as the "Unit Holder." *Id.* § 1. Section 5 of the 2015 Unit Agreement was titled "Restrictive Covenants of Unit Holder." *Id.* § 5. It imposed a series of restrictions on the Unit Holder that typically would appear in an employment agreement.

Section 5(a) imposed the following non-competition obligation on the Unit Holder:

> During the Unit Holder's employment or service period with the Company or its subsidiaries and for one-hundred-eighty (180) days thereafter following any termination of employment or service, the Unit Holder shall not, directly or indirectly, alone or as a partner, officer, director, manager, employee or consultant or equity-holder of any entity: (i) provide any wealth management

2

services, including personal financial planning or personal advisory services of the type provided or contemplated to be provided by the Company or its subsidiaries at the time of such termination to any individual or entity anywhere in the continental United States (a "Competitive Business"); (ii) provide finder, broker or financial advisory services to any Competitive Business; (iii) interfere with any potential acquisition by the Company or its subsidiaries of any other business or discourage any party to any such potential acquisition from engaging in any such transaction; or (iv) provide any services currently provided by the Company to or on behalf of its subsidiaries or affiliates to any business or enterprise that is similar to, or otherwise competitive with, the Company.

*Id.* § 5(a) (the "Non-Competition Provision").

Section 5(b) imposed the following non-solicitation obligation on the Unit Holder:

In addition, during the Unit Holder's employment or service period with the Company or its subsidiaries and for twelve (12) months thereafter, the Unit Holder shall not, directly or indirectly, alone or as a partner, officer, director, manager, employee or consultant or equity-holder of any entity . . . solicit or do business with any customer or client of the Company or any of its subsidiaries, or any potential acquisition target of the Company, any potential customer or client of the Company or any of its subsidiaries, or any potential acquisition target of the Company (A) in any manner which interferes with such person's relationship or potential relationship with the Company or its subsidiaries, or any such potential acquisition target of the Company, as the case may be, or (B) in an effort to obtain such person as a customer, client, supplier, consultant, salesman, agent or representative to any Competitive Business; or . . . work together in any business or enterprise involving wealth management services (other than the Company and its affiliates) with any other current or former senior executives of the Company.

*Id.* § 5(b) (the "Non-Solicitation Provision"; together with the Non-Competition Provision,

the "Restrictive Covenants").

Section 5(c) imposed the following restrictions on the Unit Holder's ability to share

"Confidential Information":

The Unit Holder shall not at any time, whether during or after the termination of the Unit Holder's employment or service with [Focus Parent] or its subsidiaries, reveal to any person any Confidential Information (as defined

3

below) except to employees or agents of [Focus Parent] or its subsidiaries who need to know such Confidential Information for the purposes of their employment or activities on behalf of [Focus Parent] or its subsidiaries, or as otherwise authorized by [Focus Parent] in writing. … The Unit Holder shall keep confidential all matters entrusted to the Unit Holder and shall not use or attempt to use any Confidential Information except as may be required in the ordinary course of performing the Unit Holder's duties as an employee, officer, director, agent or other representative of [Focus Parent] or its subsidiaries, nor shall the Unit Holder use any Confidential Information in any manner which injures or causes losses to [Focus Parent].

*Id.* § 5(c) (the "Confidentiality Provision"). The 2015 Unit Agreement defined "Confidential Information" broadly to include

any non-public information concerning the organization, business or finances of [Focus Parent] or its subsidiaries, or of any third party for whom [Focus Parent] is under an obligation to keep information confidential that is maintained by [Focus Parent] as confidential. Such Confidential Information shall include trade secrets or confidential information in respect of acquisition models, services, inventions, products, designs, methods, know-how, techniques, systems, processes, engineering data, software programs and software code, works of authorship, customer and supplier lists, customer and supplier information, financial information, pricing information, business plans, projects, plans, notes, memoranda, reports, data, sketches, specifications and proposals.

*Id.*

The 2015 Unit Agreement contained a choice-of-law provision selecting Delaware law. *Id.* § 6(e) (the "Delaware-Law Provision"). The 2015 Unit Agreement did not contain a provision making courts located in Delaware the exclusive forum for disputes arising out of or related to the agreement.

## C.    Holsopple Works For Focus Sub.

When Holsopple joined Focus Sub, he lived in Kansas City, Missouri, and he signed the offer letter and 2015 Unit Agreement while there. For the first three months of his

employment, Holsopple worked remotely from Kansas City. For the next two months, he commuted back and forth from Kansas City to San Francisco. In June 2015, Holsopple relocated to California. For the remainder of his tenure, he worked out of Focus Sub's San Francisco office.

Although Holsopple primarily worked for Focus Sub in San Francisco, his work was not limited to California. He traveled across the United States to meet with investment firms. But Holsopple has never worked for Focus Sub in Delaware, and none of the events giving rise to this matter took place in Delaware.

During his employment, Holsopple helped develop Focus Sub's pipeline of investment firm prospects. He also helped develop Focus Sub's proprietary methods, processes, and strategies for pursuing prospective investment firms. As part of his job, Holsopple participated in discussions with prospective investment firms, and he used Focus Sub's methods, processes, and strategies when negotiating with potential clients.

**D.     The Other Unit Agreements And The Operating Agreements**

During his employment, Holsopple signed four more Unit Agreements:

- An Incentive Unit Agreement dated January 12, 2017. Dkt 49 Ex. 2 (the "2017 Unit Agreement').

- A Long Term Incentive Program Award Agreement dated November 22, 2017. Dkt 49 Ex. 3 (the "Long-Term Agreement").

- An Incentive Unit Award Agreement dated June 18, 2018. Dkt 49 Ex. 4 (the "2018 Unit Agreement").

- An Omnibus Incentive Unit Award Agreement December 18, 2018. Dkt 49 Ex. 5 (the "Omnibus Agreement").

Holsopple signed these agreements while living in California.

5

Under the 2017 Unit Agreement, Holsopple received 25,000 incentive units. The 2017 Unit Agreement was substantively identical to the 2015 Unit Agreement.

Under the Long-Term Agreement, Holsopple received 75,000 incentive units. The Long-Term Agreement was substantively identical to the 2015 Unit Agreement, except that Section 6(h) of the Long-Term Agreement made courts located in this state the exclusive forum for any disputes. Dkt 49 Ex. 3 § 6(h) (the "Delaware-Forum Provision").

Under the 2018 Unit Agreement, Holsopple received 45,000 incentive units. The 2018 Unit Agreement was substantively identical to the 2015 Unit Agreement, except that the Non-Competition Provision in the 2018 Unit Agreement extended for a term of one year. *See* Dkt 49 Ex. 4 § 5(a).

Under the Omnibus Agreement, Holsopple received a grant of 50,651 incentive units. The Omnibus Agreement was substantively identical to the Long-Term Agreement, and it contained both a Delaware-Law Provision and a Delaware-Forum Provision.

In 2017, Focus Parent amended and restated its operating agreement. Dkt. 49 Ex. 6. In 2018, Focus Parent amended and restated its operating agreement again. Dkt. 49 Ex. 7. Both versions contained a Delaware-Forum Provision.

**E.     Holsopple Leaves Focus Sub.**

On January 6, 2020, Holsopple resigned from Focus Sub. In the months before his resignation, Holsopple downloaded confidential information and trade secrets concerning Focus Sub's prospects. He also sent himself a number of emails containing Focus Sub's confidential information.

Around three weeks before he resigned, Holsopple requested and received an overview of the amendments to the management agreements for new business partners that were then in process. Those documents reflected the financial terms that Focus Sub discussed or had agreed to with its new partners and prospective clients. On January 6, 2020, the same day that he resigned, Holsopple received detailed spreadsheets reflecting confidential business development efforts and active negotiations with investment firm prospects. Before returning his electronic devices to Focus Sub, Holsopple wiped them clean of information.

**F.      Holsopple Joins Hightower.**

On February 20, 2020, Holsopple joined Hightower. He accepted the position of Chief Growth Officer, a job with responsibilities comparable to his former position with Focus Sub. Holsopple continues to live and work in San Francisco.

After learning that Holsopple had joined a competitor, Focus Parent sent a letter to Holsopple reminding him that he remained bound by the Restrictive Covenants and the Confidentiality Provisions. Focus Parent also sent a letter to Hightower that identified the provisions binding Holsopple. Focus Parent did not receive any response.

Since Holsopple's arrival, Hightower has invested in two firms that Focus Sub had courted while Holsopple was an employee. Focus Parent believes that Hightower is recruiting a third investment firm that Focus Sub had been pursuing.

**G.      Litigation Ensues.**

On March 11, 2020, Focus Parent filed this action against Holsopple and Hightower. Five days later, on March 16, Holsopple and Hightower filed an action against Focus Parent

in the Superior Court for the County of San Francisco (respectively, the "California Action" and the "California Court"). In the California Action, Holsopple and Hightower sought declarations that the Restrictive Covenants, the Delaware-Law Provisions, and the Delaware-Forum Provisions are invalid and unenforceable under California law.

On March 30, 2020, Focus Parent filed an application in this action for an anti-suit injunction that would have forced Holsopple and Hightower to dismiss the California Action. In their opposition, Holsopple and Hightower pointed out that Focus Parent had not asserted a claim in this action that supported that relief. Focus Parent then filed an amended complaint that asserted claims for breach of the Delaware-Forum Provisions. At the conclusion of a hearing on April 16, 2020, this court denied the application for an anti-suit injunction.

In May 2020, Holsopple and Hightower moved to dismiss the amended complaint. In response, Focus Parent filed its second amended complaint, which is the currently operative pleading. It contains six causes of action:

- Count I asserts that Holsopple breached Restrictive Covenants, Confidentiality Provisions, and Delaware-Forum Provisions in the Unit Agreements.

- Count II asserts that Holsopple and Hightower misappropriated trade secrets in violation of the Delaware Uniform Trade Secrets Act.

- Count III asserts that Holsopple breached the Delaware-Forum Provisions in Focus Parent's operating agreements.

- Count IV seeks injunctive relief against Holsopple and Hightower, which is a remedy rather than a claim.

- Count V contends that Hightower tortiously interfered with the Unit Agreements and the Delaware-Forum Provisions in Focus Parent's operating agreements.

8

- Count VI alleges that both Holsopple and Hightower tortiously interfered with prospective business relations.

After the filing of the currently operative complaint, Holsopple and Hightower renewed their motion to dismiss

Meanwhile, in June 2020, Focus Parent filed counterclaims in the California Action against Holsopple and Hightower. The counterclaims contain seven counts:

- Count I asserts that Holsopple breached Confidentiality Provisions in the Unit Agreements.

- Count II asserts that Holsopple and Hightower misappropriated trade secrets in violation of the California Uniform Trade Secrets Act.

- Count III contends that Hightower tortiously interfered with the Unit Agreements.

- Count IV asserts that Holsopple breached the Non-Competition Provisions in the Unit Agreements.

- Count V asserts that Holsopple breached the Non-Solicitation Provisions in the Unit Agreements.

- Count VI alleges that both Holsopple and Hightower tortiously interfered with Focus Sub's prospective business relations.

- Count VII seeks injunctive relief against Holsopple and Hightower to enforce the Confidentiality Provisions in the Unit Agreements.

Dkt. 52, Ex. J.

Holsopple and Hightower moved to dismiss Focus Parent's counterclaims in the California Action. By order dated September 1, 2020, the California Court denied that motion, stating as follows:

> Non-Solicitation/Competition. The FACC's fourth and fifth causes of action are adequately pled. Whether Delaware or California law applies is to be litigated. A Delaware court appears to have deferred to California's courts on the issue.

9

Interference Torts. The FACC's third cause of action (tortious interference with contract) requires no "independently wrongful" act. (*Korea Supply Co. v. Lockheed Martin* Corp. (2003) 29 Cal. 4th 1134, 1158.) (Defendants do not establish that Holsopple was a Focus employee.) The FACC's sixth cause of action (tortious interference with prospective business relations) adequately pleads independently wrongful acts - e.g., misappropriations of confidential information. (FACC para. 129–135.)

Trade Secrets. The FACC adequately pleads trade secrets misappropriation. (FACC para. 95–105.) Particularization of secrets typically comes after the pleading stage. (CCP 2019.210.) The "economic loss rule" does not apply here. (*Aas v. Sup. Ct.* (2000) 24 Cal.4th 627, 635–36.)

Harm. Focus adequately pled that it was harmed. (FACC para. 83, 87, 114, 121.)

"Information and Belief." The few facts in Focus' 149-paragraph FACC pled on "information and belief, are appropriate. (*J.W. v. Watchtower Bible & Tract Society of New York, Inc.* (2018) 29 Cal.App.5th 1142, I 166.)

Preemption. The CUTSA does not preempt claims that, as here, have elements and/or fact different than those for trade secret misappropriation. (*Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 506.).

Dkt. 66 Ex. A (formatting added).

After the California Court's ruling, the parties began conducting discovery in the California Action. Both sides served discovery requests and provided their objections and responses. Document production is underway. Depositions will follow. By contrast, in this action, this court has not ruled on the pleading-stage viability of Focus Parent's claims, and discovery has not yet begun.

## II.     LEGAL ANALYSIS

Hightower has moved to dismiss this action under the doctrine of *forum non conveniens*. A motion invoking this doctrine proceeds under Rule 12(b)(3) and seeks dismissal on grounds of improper venue. *See Lefkotwtiz v. HWF Hldgs., LLC*, 2009 WL

10

3806299, at *3 (Del. Ch. Nov. 13, 2009). When considering such a motion, the court "is not shackled to the plaintiff's complaint" and "is permitted to consider extrinsic evidence from the outset." *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 (Del. Ch. Oct. 19, 2000); *accord Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007).

When evaluating a motion based on *forum non conveniens*, a Delaware court considers the so-called "*Cryo-Maid* factors." *See Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (Del. 1964). In paraphrased form, they are:

(1) the existence of other litigation involving substantially similar parties or subject matter;

(2) whether the controversy depends upon a question of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;

(3) the relative ease of access to proof;

(4) the availability of compulsory process for witnesses;

(5) any other matters that would affect the conduct of the litigation and the expeditious and economic administration of justice.[2]

---

[2] *Id.*; *accord Martinez v. E.I. DuPont de Nemours & Co., Inc.*, 86 A.3d 1102, 1104 (Del. 2014). The Delaware Supreme Court's recent discussions of *forum non conveniens* have addressed cases involving claims arising under the law of foreign countries and potential deference to courts in those countries. *See, e.g.*, *Aranda v. Philip Morris USA Inc.*, 183 A.3d 1245, 1253 (Del. 2018) (Argentina); *Gramercy Emerging Mkts. Fund v. Allied Irish Banks, P.L.C.*, 173 A.3d 1033, 1043 (Del. 2017) (Bulgaria); *Martinez*, 86 A.3d at 1107 (Argentina). The distinction between intra-country deference to another state and international deference to another country is one of degree, rather than kind. Although it is relatively less likely that litigating claims under the law of another American state will result in overwhelming hardship for purposes of *forum non conveniens*, the same underlying concepts and principles apply.

11

The preceding list identifies the factors in what seems to be their relative order of importance for corporate and commercial disputes.[3] "Together, these factors have come to represent the core of Delaware's traditional *forum non conveniens* analysis." *Gramercy*, 173 A.3d at 1036.

The first *Cryo-Maid* factor is critically important and causes Delaware courts to approach the overall analysis from different standpoints. *See id.* If there is a prior-filed action, pending elsewhere, involving substantially the same parties and the same issues, and if the court in the other jurisdiction is capable of rendering prompt and complete justice, then a Delaware court will generally exercise its discretion by deferring to the prior-filed action. *See McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, 263 A.2d 281, 283 (Del. 1970). Although *McWane* calls presumptively for deference to a prior-filed action, a court may still consider the traditional *Cryo-Maid* factors, recognizing that they typically (but not always) will align in favor of deference to a first-filed action that satisfies the *McWane* test. *See Gramercy*, 173 A.3d at 1036.

By contrast, if the plaintiff filed first in this state, then a defendant generally will be able to obtain dismissal under the doctrine of *forum non conveniens* only by establishing

---

[3] The list omits a sixth *Cryo-Maid* factor—"the possibility of the view of the premises"—because that factor is frequently irrelevant in corporate and commercial disputes. *See, e.g., Hall v. Maritek Corp.,* 170 A.3d 149, 162 (Del. Super. Ct. 2017) ("[T]he third *Cryo–Maid* factor holds little to no weight even in a case where there was a relevant premises that the fact-finder might want to view.") (internal quotations omitted), *aff'd*, 182 A.3d 113 (Del. 2018); *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1212 (Del. Ch. 2010) (collecting authorities). A view of the premises is not relevant to this case, and this decision therefore does not discuss it.

12

that litigating in Delaware would result in "overwhelming hardship." *Ison v. E.I. DuPont de Nemours & Co., Inc.*, 729 A.2d 832, 842 (Del. 1999). Although the test sounds extreme, trial judges should not perceive that the standard "suggests an insurmountable burden for defendants." *Martinez*, 86 A.2d at 1105. The test "is not intended to be preclusive." *Id.*; *accord Ison*, 729 A.2d at 842. "[I]t is intended as a stringent standard that holds defendants who seek to deprive a plaintiff of her chosen forum to an appropriately high burden." *Martinez*, 86 A.2d at 1105. What is required is that the *Cryo-Maid* factors weigh "heavily and decisively" in favor of dismissal. *IM2 Merch. & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at *7 (Del. Ch. Nov. 2, 2000); *see Martinez*, 86 A.3d at 1105 (discussing *IM2* with approval and agreeing that "a more restrained meaning is at the essence of the [overwhelming hardship] standard") (quoting *IM2*, 2000 WL 1664168, at *8 (bracketed text in original)).

When considering whether the *Cryo-Maid* factors weigh heavily and decisively in favor of dismissal, the court should not treat them as a checklist or tally sheet. "Application of these factors is neither mechanical nor mathematical." *Pipal Tech Ventures Priv. Ltd. v. MoEngage, Inc.*, 2015 WL 9257869, at *5 (Del. Ch. Dec. 17, 2015). The court must "look to the circumstances as a whole to determine whether an overwhelming hardship is present." *VTB Bank v. Navitron Proj. Corp.*, 2014 WL 1691250, at *6 (Del. Ch. Apr. 28, 2014) (citation omitted). "The moving defendant need not show that it is factually or financially impossible to mount a defense in this jurisdiction." *Pipal Tech*, 2015 WL 9257869, at *5. When "properly applied," the doctrine "involves a wholesome balancing between the strong interest of a plaintiff in choosing the appropriate forum in which to

13

bring her action, and the interest of the other litigants and the court in an efficient and just resolution of the issues, together with principals of comity." *Wilmington Sav. Fund Soc'y, FSB v. Caesars Entm't Corp.*, 2015 WL 1306754, at \*7 (Del. Ch. Mar. 18, 2015).

The two principal legal frameworks—presumptive deference to a first-filed action elsewhere under *McWane* or presumptively proceeding with a first-filed action in Delaware—are not exclusive alternatives. *Gramercy*, 173 A.3d at 1036. Other settings call for "an intermediate analysis" that deploys "a straightforward assessment of the *Cryo–Maid* factors, where dismissal is appropriate if those factors weigh in favor of that outcome." *Id.* One such setting involves a first-filed action elsewhere that was subsequently dismissed. *See id.* Another setting is where the competing actions were filed virtually simultaneously, warranting less deference to the winner of a race to the courthouse.[4] A third setting involves a request to stay (rather than dismiss) the Delaware action where the resolution of the competing proceeding will not have issue-preclusive effects on the Delaware action. Under those circumstances, the court may place less emphasis on filing priority and determine by a preponderance of the evidence whether litigating in one forum or the other would be easier, more expeditious, and less expensive.[5]

---

[4] *See HFTP Investments, L.L.C. v. ARIAD Pharm., Inc.*, 752 A.2d 115, 122 (Del. Ch. 1999); *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at \*15 (Del. Ch. July 14, 2008); *Rapoport v. Litig. Trust of MDIP Inc.*, 2005 WL 3277911, at \*2 (Del. Ch. Nov. 23, 2005).

[5] *Compare Moore Golf, Inc. v. Ewing*, 269 A.2d 51, 52 (Del. 1970) ("[T]he burden on the moving party is a lesser one when a stay rather than a dismissal is sought."), *with Nokia Sols. & Networks Oy v. Collision Comm'cns, Inc.*, 2020 WL 2095829, at \*5 (Del.

14

On the facts of this case, Hightower would suffer overwhelming hardship (in the sense that term is used for *forum non conveniens* analysis) if forced to litigate in Delaware while the California Action is proceeding. The California Action has moved far ahead of this proceeding, and with Holsopple's dismissal from this case, the California Action is broader and more capable of providing complete relief. The California Action implicates important questions of California law, and the California Court is better suited to address those questions than this court. Having both cases proceed in parallel risks wasting judicial and litigant resources, and doing so could produce conflicting results, particularly because Holsopple is not present here. Under the circumstances, the doctrine of *forum non conveniens* calls for dismissal.

## A.     The Existence Of Other Litigation

The first *Cryo-Maid* factor considers the existence of other litigation involving substantially similar parties or subject matter, as well as the nature and state of the competing litigation. This factor holds priority of place in the *Cryo-Maid* analysis because of the different presumptions that depend on the existence of a prior filed action that meets the *McWane* test. But as discussed above, the dividing line between *McWane* and *Cryo-Maid* is not rigid, and an equally important consideration is the degree to which one jurisdiction or the other has engaged with the case and expended judicial resources. "If a judge in one forum has invested actual, substantive effort in a case, a competing forum

_____

Super. Apr. 30, 2020) (explaining that when "a stay likely will have the same effect as a dismissal," the party seeking a stay must meet the traditional *forum non conveniens* test).

should consider carefully whether one of its judges should make a similar case-specific investment." *Hamilton P'rs*, 11 A.3d at 1217; *see, e.g., Brookstone Parts Acq. XVI, LLC v. Tanus*, 2012 WL 5868902, at *7 (Del. Ch. Nov. 20, 2012) (observing that if the Texas and Delaware actions proceeded simultaneously, then the parties would be forced to engage in "piecemeal litigation" and "duplicative efforts," which would risk "inconsistent judgments" from the courts); *Sprint Nextel Corp.*, 2008 WL 2737409, at *17 (taking into account duplication of effort and the risk of inconsistent judgments in *forum non conveniens* analysis).

Here, the Delaware action technically was filed first, but only by a nose. Focus Parent filed this action five days before Holsopple and Hightower filed the California Action. Additionally, Holsopple and Hightower put at issue the validity of the Delaware-Forum Provisions in the California Action before Focus Parent amended its complaint here to claim that Holsopple breached the Delaware-Forum Provisions. This is not a case where the Delaware plaintiff had a significant timing advantage.

Moreover, since their roughly cotemporaneous filing, the California Action has moved ahead of this action. The California Court has addressed the pleading-stage merits of Focus Parent's claims by denying Holsopple and Hightower's motion to dismiss. This court has not addressed a Rule 12(b)(6) motion. And after the California Court denied Holsopple and Hightower's motion to dismiss, the parties began discovery. They have served and responded to discovery requests, and they are beginning to conduct depositions. This court has yet to address the pleading-stage viability of Focus Parent's claims, and no discovery has taken place in this case.

16

Instead, this court has dismissed Holsopple from this action. *See Jurisdiction Decision*, 2020 WL 6266915, at *30. As a result, the current action can proceed only against Hightower. One of Focus Parent's claims against Hightower contends that Hightower tortiously interfered with the Unit Agreements. That claim depends on Focus Parent proving a predicate breach of contract against Holsopple. At this point, litigating that claim against Hightower in this court will be awkward at best, because Holsopple is no longer a party. The California Court does not face this problem, because both Holsopple and Hightower remain parties to the California Action. *Cf. Midland Food Servs. v. Castle Hills Hldgs.*, 1999 WL 669324, at *2 (Del. Ch. Aug. 10, 1999) ("One of the Counterclaims is that the Midland Companies have tortiously interfered with the Castle Hill Companies' relations with CNL. Wouldn't it make much more sense to litigate that claim in the presence of CNL?"), *aff'd*, 782 A.2d 265 (Del. 2001). "As a general matter, and all else being equal, it is sensible that the court which has before it all the claims arising out of a particular constellation of facts should be the forum that adjudicates those claims." *ARIAD*, 752 A.2d at 124. That is true for the California Action and untrue for this action.

The existence, nature, and stage of the California Action raises concerns about duplication of effort and potentially conflicting results.[6] Even when jurists strive to

---

[6] *Nokia Sols.*, 2020 WL 2095829, at *6 ("[A]lowing two substantially overlapping actions to proceed simultaneously would require two courts to adjudicate the same contractual dispute, risking a significant waste of judicial resources and inconsistent resolution of the issues."); *In re Bay Hills Emerging Partners I, L.P.*, 2018 WL 3217650, at *8 (Del. Ch. July 2, 2018) ("The simultaneous procession of both actions risks the significant waste of scarce judicial resources and, more importantly, the inconsistent

17

coordinate their proceedings, parties invariably perceive and seek advantage by having one judge rather than another address a particular issue. Given the more advanced stage of the California case, the risk here is that this court would duplicate the efforts of the California Court and risk inadvertently creating a conflicting ruling.

On the record presented here, the California Action is more advanced, and Holsopple, the primary defendant, is present there. These factors weigh heavily in favor of dismissing this case on grounds of *forum non conveniens*.

## B. Delaware's Interest In The Dispute

The second *Cryo-Maid* factor asks whether Delaware law will govern the dispute. As the Delaware Supreme Court held in the original *Cryo-Maid* decision, the question is "whether or not the controversy is dependent upon the application of Delaware law . . ." 198 A.2d at 684. Further elevating the importance of this factor, the Delaware Supreme Court has recognized "the right of all parties (not only plaintiffs) to have important, uncertain questions of law decided by the courts whose law is at stake." *Martinez*, 86 A.2d at 1103.

The choice-of-law factor under the *Cryo-Maid* analysis does not merely involve an academic inquiry into what law to apply. It functions as an indication of Delaware's interest in the dispute. *See Hamilton P'rs*, 11 A.3d at 1212. "The United States is a federal republic

---

resolution of relevant issues."); *see also Salzman v. Canaan Capital P'rs, L.P.*, 1996 WL 422341, at *6 (Del. Ch. July 23, 1996); *In re Chambers Dec. Co., Inc. S'holders Litig.*, 1993 WL 179335, at *6 (Del. Ch. May 20, 1993).

that depends on comity among the states for the peaceful and efficient conduct . . . of private commerce." *Third Ave. Trust v. MBIA Ins. Corp.*, 2009 WL 3465985, at \*1 (Del.Ch. Oct. 28, 2009). "When a state court with little legitimate interest in a matter purports to speak on a subject of importance to a sister state, the reliability of state law is undermined and a counterproductive incentive is created for all state courts to afford less than ideal respect to each other." *Id.* Whether a Delaware court should defer to a different jurisdiction takes into account the degree to which Delaware has a particular interest in the subject matter of the case. The analysis "therefore includes considerations such as the nature and novelty of questions of law to be answered, the desirability of providing a Delaware forum, and the importance of overseeing the conduct of particular classes of actors and policing against particular types of wrongdoing." *Hamilton P'rs*, 11 A.3d at 1213.

If Delaware law applies to a dispute, and if the dispute involves a novel issue of Delaware law, and particularly if the question of Delaware law involves the internal affairs of a Delaware entity, then this *Cryo-Maid* factor will weigh heavily in favor of the plaintiff's choice of forum and against a finding of overwhelming hardship. But the converse is equally true. Delaware has a lesser interest in deciding cases that deal with "complex and unsettled issues" under the laws of other jurisdictions. *Hupan v. All. One Int'l, Inc.*, 2015 WL 7776659, at \*8 (Del. Super. Nov. 30, 2015), *aff'd sub nom. Aranda v. Philip Morris USA Inc.*, 183 A.3d 1245 (Del. 2018). And when a dispute does not involve a matter where Delaware has a significant interest, it is important for Delaware to defer to the greater interest of a sister state.

19

The Delaware courts have long asserted that this state has a compelling interest in the efficient and consistent application of its laws governing business entities. For that reason, our courts have been far less willing to defer to tribunals in other states when unsettled issues of Delaware law are at stake. These rulings have recognized the reality that it is often judicial decisions that give practitioners the practical guidance they need about how much discretion their clients have to act. Those rulings also suggest that Delaware has a related and equally important interest in affording comity to the courts of other jurisdictions when a dispute arises under foreign business law. . . .

If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect.... [Failing to do so] risks undermining the certainty of application that business entities depend upon, and should, in my view, be given extremely heavy weight in a rational forum non conveniens analysis.

*Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 451–52 (Del. Ch. 2007); *see In re Topps Co. Shareholders Litig.*, 924 A.2d 951, 962 (Del. Ch. 2007) ("One can imagine a myriad of contract, employment, worker safety, environmental, and tort claims against Topps that would be much more properly heard in a New York court than in this court, irrespective of Topps' status as a Delaware corporation. In such cases, this court would not hesitate to defer in a 'New York minute,' as it were.").

For the reasons that follow, this case does not present novel issues of Delaware law. Indeed, it is unlikely to present any meaningful issues of Delaware law. By contrast, this case will present significant issues under California law. And once Focus Parent is no longer wedded to arguing that Delaware law should apply as part of its effort to stay in this forum, Focus Parent may invoke New York law, because there is good reason to think that New York law could govern some of the issues in dispute.

20

## 1. The Law That Will Likely Govern Focus Parent's Claims

It is unlikely that Delaware law governs any of Focus Parent's claims.[7] At the pleading stage, the only claim where it is reasonably conceivable that Delaware law could apply is the predicate breach of the Confidentiality Provisions, which is an aspect of Focus Parent's claim against Hightower for tortious interference with contract. Otherwise, California law permeates the case.

### a. Count I: Breach Of The Restrictive Covenants.

In Count I of the complaint, Focus Parent asserts that Holsopple breached the Restrictive Covenants. Although this court has dismissed Holsopple from the case, Focus Parent relies on this claim as a predicate for its claim against Hightower for tortious

---

[7] This section does not address the aspects of Focus Parent's claims that turn on the Delaware-Forum Provisions. This court previously held that California law governs those provisions and renders them invalid for purposes of Focus Parent's claims against Holsopple. *See Jurisdiction Decision*, 2020 WL 6266915, at \*28, \*30**.** It is therefore unnecessary to consider those claims further. This observation applies to Focus Parent's claim in Count I against Holsopple for breach of the Delaware-Forum Provisions in the Unit Agreements, its claim in Count III against Holsopple for breach of Delaware-Forum Provisions in Focus Parent's operating agreements, and its claim against Hightower in Count IV for tortiously interfering with the Delaware-Forum Provisions in the Unit Agreements and in Focus Parent's operating agreements. This section also does not address Count IV, which sought injunctive relief, because that is a request for a specific type of remedy. The law of the forum generally governs remedial issues, unless the question of remedy is bound closely to the rule of substantive law. *See generally Naughty Monkey LLC v. Marinemax Northeast LLC*, 2010 WL 55545409, at \*8 n.59 (Del. Ch. Dec. 23, 2010) (summarizing applicable principles). The substantive law therefore drives the choice-of-law analysis, with issues of remedy playing a secondary role. To that end, the Delaware Supreme Court has cautioned that choice-of-law rulings should not turn on "the judge's perceptions of the remedies available to plaintiffs in particular jurisdictions." *Bell Helicopter Textron v. Artega*, 113 A.3d 1045, 1052 (Del. 2015).

interference with contract. For purposes of the *forum non conveniens* analysis, it is highly unlikely that Delaware law will govern this claim. Instead, it is highly likely that California law will apply.

### i. Authorities Indicating That California Law Will Apply

Delaware follows the *Restatement (Second) of Conflict of Laws* when determining what law governs a contract. *Certain Underwriters at Lloyds, Condon v. Chemtura Corp*., 160 A.3d 457, 464 (Del. 2017). For the reasons explained in the *Jurisdiction Decision*, California is the default state whose law would govern the Restrictive Covenants absent the Delaware-Law Provision. It is not is not reasonably conceivable that Delaware is the default state. *See* 2020 WL 6266915, at *13.

As explained in the *Jurisdiction Decision*, the next step in the choice-of-law analysis is to determine whether there is an actual conflict between the laws of the different states. *Id.* at *21. For purposes of a claim for breach of the Restrictive Covenants, there is an actual conflict between California and Delaware law.

California has a longstanding public policy in favor of "open competition and employee mobility." *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 291 (Cal. 2008). That policy dates back to 1872, when the California Legislature enacted the predecessor to what is now Section 16600 of the California Business and Professional Code. The predecessor statute stated: "Every contract by which any one is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided by the next two sections, is to that extent void." Cal. Civ. C. § 1673 (*repealed by* Stat. 1941, c. 526, p. 1847, § 2). The two subsequent sections created exceptions for contractual restraints

22

entered into in connection with the sale of goodwill in a business, Cal. Civ. C. § 1674 (*repealed by* Stat. 1941, c. 526, p. 1847, § 2), or upon dissolution of a partnership. Cal. Civ. C. § 1675 (*repealed by* Stat. 1941, c. 526, p. 1847, § 2).

The same basic statutory structure persists to this day. In its contemporary form, the statute states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. C. § 16600. "Under the statute's plain meaning, therefore, an employer cannot restrain a former employee from engaging in his or her profession, trade, or business by contract unless the agreement falls within one of the exceptions to the rule." *Edwards*, 44 P.3d at 289. The only exception applies when a person agrees to a noncompetition agreement in connection with the sale of a corporation (§ 16601), partnership (§ 16602), or limited liability company (§ 16602.5). The prohibition established by Section 16600 applies both to noncompetition agreements and to non-solicitation agreements concerning customers and employees.[8]

Delaware law, by contrast, generally enforces restrictive covenants that are "reasonable in scope and duration, . . . advance a legitimate economic interest of the

---

[8] *See Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 582, 586 (2020) (discussing anti-solicitation covenants in *Edwards* and explaining that under California law, restraints on employment relationships, like noncompetition or non-solicitation agreements, are "per se invalid."); *NuVasive, Inc. v. Miles* (*NuVasive II*), 2019 WL 4010814, at *4–7 (Del. Ch. Aug. 26, 2019) (explaining that that *Edwards* addressed both a non-competition covenant and an anti-solicitation covenant and reasoning that Section 16600 applies to both).

[former employer], and . . . survive a balance of the equities." *Weichert Co. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007). A non-competition agreement that meets these standards will be enforced unless "oppressive to an employee."[9] The same principles apply to non-solicitation provisions. *See Cabela's LLC v. Wellman,* 2018 WL 5309954, at *8 (Del. Ch. Oct. 26, 2018).

The contrasting approaches under Delaware and California law result in a true conflict, making a choice-of-law determination necessary. To resolve the conflict, this court must determine whether the law of the chosen state would generate an outcome that would be "contrary to a fundamental policy" of the default state on an issue where the default state "has a materially greater interest than the chosen state." *Restatement (Second) of Conflict of Laws* § 187 (1971) [hereinafter *Restatement*].

This court has recognized consistently that California has a fundamental public policy against non-competition and non-solicitation provisions and that California has a materially greater interest in that policy than Delaware's interest in promoting freedom of contract. This court made that determination explicitly in the seminal *Ascension* decision. *See Ascension Ins. Hldgs., LLC v. Underwood,* 2015 WL 356002, at *1 (Del. Ch. Jan. 28, 2015). There, a California resident (Underwood) sold his financial planning business to a Delaware limited liability company (Ascension) under an asset purchase agreement. *Id.* at

---

[9] *EDIX Media Grp. v. Mahani*, 2006 WL 3742595, at *7-8 (Del. Ch. Dec. 12, 2006); *see Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *6, 14-15 (Del. Ch. Jan. 17, 2007); *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *6, 15 (Del. Ch. Oct. 23, 2002).

24

*1. As part of the deal, Underwood entered into an employment agreement with Ascension. *Id.* Both agreements contained restrictive covenants which bound Underwood not to compete with Ascension for five years after the sale. *Id.* Five months later, Underwood and Ascension entered into an Employee Investment Agreement ("EIA") that granted Underwood the right to purchase units in Ascension and which contained restrictive covenants that bound Underwood not to compete with Ascension for two years after his employment ended. *Id.* The EIA selected Delaware law to govern its terms and provided for a Delaware forum. *Id.*

In 2015, seven years after the sale of his business, Underwood left Ascension and began working for a competitor. *Id.* The five-year restrictive covenants in the asset purchase agreement and employment agreement had expired, so Ascension sought to enforce the two-year, post-employment covenants in the EIA. Ascension argued that the restrictive covenants were enforceable under Delaware law and that Delaware's interest in freedom of contract prevailed over any California's interest in protecting its residents and regulating employment relationships. *Id.* at *3. This court disagreed, trenchantly explaining why a sister state's policy interest in adopting specific legislation to govern a particular substantive area, such as employment, must necessarily trump a generalized interest in freedom of contract:

> The performance of the covenant not to compete in that agreement is against a clear public policy of California stated unequivocally by statute. Against this is a general interest of Delaware in freedom of contract. Without minimizing that significant interest, it seems to me that, where it is clear that the policy of the default state is that the contract at issue is abhorrent and void, and where, as here, the formation and enforcement of the contract relate overwhelmingly to the default state, a general interest in freedom of contract

25

is unlikely to be the equal of that public policy under the Restatement analysis.

The entire purpose of the Restatement analysis is to prevent parties from contracting around the law of the default state by importing the law of a more contractarian state, unless that second state also has a compelling interest in enforcement. In other words, in *every instance* where the parties seek to circumvent application of the law of the default state, the state whose law *was* chosen and is asked to enforce the contract will have the interest of protecting freedom to contract.

It would be a tautology to suggest that such an interest alone, arising in every case, can trump the public interest of the default state, which, by definition, has the greatest contacts with the contract at issue; otherwise, the Restatement test would be meaningless, and the default state would lose its ability to constrain pernicious enforcement of contract rights.

*Id.* at *5 (formatting added).

Other decisions have reached the same conclusion and held that California law will govern a restrictive covenant, notwithstanding a choice-of-law provision selecting Delaware law.[10] And this court has reached the same conclusion when weighing

---

[10] *See NuVasive II*, 2018 WL 4677607, at *7 (concluding that California law's status as the default state with a materially greater interest in the dispute overrode choice-of-law provision selecting Delaware where Delaware law conflicted with California's fundamental public policy); *see also Hewlett-Packard Co. v. Ghilardi*, C.A. No. 11233-VCN, (Del. Ch. July 9, 2015) (TRANSCRIPT) (denying motion for temporary restraining order to enforce a noncompetition provision against a California defendant). *Cf. NuVasive, Inc. v. Miles* (*NuVasive I*), 2018 WL 4677607, *3-6 (Del. Ch. Sept. 28, 2018) (explaining that under *Ascension*, California's status as the default state with a materially greater interest in the dispute typically would override the choice-of-law provision in the event of a conflict between California and Delaware law, but for purposes of the employee's motion for summary judgment, the transaction was assumed to fall within an exception to the California statute, so no conflict existed); *EBP Lifestyle Brands Hldgs, Inc. v. Boulbain*, 2018 W: 3329363, at *1-2, 4, 8 n.43 (Del Ch. Aug. 4, 2017) (indicating in *dictum* that the reasoning of *Ascension* would apply to restrictive covenants that appeared in a stockholders agreement that a Delaware corporation with its principal place of business in California

26

Delaware's interest in freedom of contract against the interests of other states that have similar public policies against non-competition and non-solicitation provisions.[11]

To distinguish these cases, Focus Parent argues that they all involved scenarios where both parties to the contract resided in the state that had a fundamental public policy against restrictive covenants. That is not accurate. One of the decisions involved a Delaware corporation with a principal place of business in Tennessee that brought suit against an Alabama employee. The court held that Alabama had a significant interest in the dispute that was materially greater than Delaware's such that Alabama's law on restrictive covenants would apply. *FP UC Hldgs*. 2020 WL 1492783, at *10-11.

Regardless, the location and citizenship of the parties to the contract are considerations when determining which state's law would apply by default in the absence of the choice-of-law provision. Once the court makes that determination, the *Restatement* calls for weighing the policy interest of the default state against the policy interest of the selected jurisdiction. The location and citizenship of the parties are not factors when weighing the competing policy interests of the two states. What matters at that stage is the competing policy interests themselves.

---

required employee located in California to execute as a condition to receiving stock options).

[11] *See FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *10–11 (Del. Ch. Mar. 27, 2020) (Alabama law); *Cabela's*, 2018 WL 5309954, at *7 (Nebraska law).

The weight of Delaware authority thus recognizes that sister states, like California, who have chosen to regulate restrictive covenants have a fundamental policy interest in having their substantive law apply. The weight of Delaware authority likewise recognizes that those sister states have a materially greater interest in having their substantive law apply than Delaware's interest in promoting freedom of contract. As between Delaware law and California law, it is highly likely that Delaware law will apply to Focus Parent's claim for breach of the Restrictive Covenants.

To resist this result and argue that Delaware law should prevail over California law, Focus Parent discounts *Ascension* and its progeny in favor of an earlier transcript ruling from this court and three decisions from the United States District Court for the District of Delaware (the "District Court").[12] The three District Court decisions each rely heavily on *Coface Collections North America Inc. v. Newton*, 430 Fed. App'x. 162 (3d Cir. 2011), a non-precedential decision from the United States Court of Appeals for the Third Circuit. For purposes of the Restrictive Covenants in this case, Focus Parent's authorities are unpersuasive.

---

[12] *See W.R. Berkley Corp. v. Niemela*, 2019 WL 5457689 (D. Del. Oct. 24, 2019); *Advanced Reimbursement Mgmt. LLC v. Plaisance*, 2019 WL 2502931 (D. Del. June 17, 2019); *Sensus USA, Inc. v. Franklin*, 2016 WL 1466488 (D. Del. Apr. 14, 2016). More recently, the District Court issued a decision that followed *Ascension* and its progeny, and the court of appeals affirmed that ruling. *See Cabela's LLC v. Highby,* 362 F. Supp. 3d 208, 219 (D. Del. 2019), *aff'd,* 801 F. App'x 48 (3d Cir. 2020). Focus Parent did not cite the more recent federal cases.

### ii.    *DGWL*

Focus Parent first relies on a transcript ruling that pre-dated *Ascension*. *See DGWL Investment Corp. v. Giannini*, C.A. No. 8647-VCP (Del. Ch. Sept. 19, 2013) (TRANSCRIPT). Bench rulings can provide persuasive authority. *See, e.g.*, *Pettry v. Gilead Sciences, Inc.*, C.A. No. 2020-0132-KSJM, tr. 55 (Del. Ch. May 28, 2020); *Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020). Nevertheless, a bench ruling typically reflects a case-specific determination that is intended for the parties, and by virtue of being spoken rather than written, its language and implications may be less clear. Compared to the written decisions in *Ascension*, *NuVasive I*, *NuVasive II*, *Cabela's*, and *FP UC Holdings*, the *DGWL* ruling starts at a disadvantage.

The *DGWL* ruling addressed the sale of a controlling interest in a Delaware limited liability company. In conjunction with the transaction, the seller agreed to a restrictive covenant. In return, he received total consideration of $10 million, both for the controlling interest *and* the restrictive covenant. *DGWL*, tr. at 9. The restrictive covenant thus did not conflict with California public policy because it fell within the exception to California's prohibition against non-compete agreements that applies to the sale of a business. *Id.* at 10. The *DGWL* decision did not involve a true conflict, and it is factually distinguishable from a case involving a restrictive covenant that binds an employee.

In *dictum*, the *DGWL* court stated that even if the restrictive covenant were contrary to California law, then California did not have a materially greater interest in its statutory policy that outweighed Delaware's interest in freedom of contract. *Id.* at 12. It is not clear whether that holding would survive analysis under *Ascension* and its progeny, but it was

29

nevertheless defensible on the facts of the case, precisely because the restrictive agreement was part of a transaction that involved the sale of a business, and the purchase price attributed value to the restrictive covenant.

This case is a straightforward employment dispute. It does not involve the sale of a business. The transcript ruling in *DGWL* therefore is not persuasive.

### iii. *Coface*

Because the three District Court decisions that Focus Parent champions all rely on *Coface*, it is important to understand the facts and reasoning of that decision. Coface Collections North America Inc. was a Delaware corporation that engaged in the business of debt collection. Under an asset purchase agreement, Coface acquired Newton & Associates LLC, another firm engaged in the business of debt collection. The seller was William Newton, a Louisiana citizen who owned and operated the firm. The asset purchase agreement contained several restrictive covenants, including a non-competition covenant which provided that Newton would not compete with Coface for a period of five years. The parties signed the agreement in Louisiana. *See* 430 Fed. App'x. at 163.

After the sale, Newton served as Coface's president until December 2008. He left formal employment but continued to provide consulting services to Coface for two more years. In January 2011, he formed and began operating a new debt-collection firm in Louisiana. When Coface sued to enforce the noncompetition agreement, Newton argued that Louisiana law applied and limited the restrictive covenant to two years. *See id.* (citing La. R.S. 23:921(B)). Coface responded that Delaware law governed because of a Delaware choice-of-law provision in the asset purchase agreement.

When conducting its choice-of-law analysis, the *Coface* court relied heavily on *Abry Partners*, a factually distinguishable case. *See Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006). The plaintiff in *Abry Partners* was a private equity firm based in Massachusetts that purchased all of the stock in a Delaware corporation that operated in Ohio from another private equity firm based in Rhode Island. *Id.* at 1046. After the transaction closed, the buyer sued for fraud. The stock purchase agreement contained a Delaware choice-of-law provision, but the buyer argued that its fraud claim did not arise under the contract and therefore was not governed by the provision. According to the buyer, because its operations were located in Massachusetts, the law of Massachusetts applied. *Id.*

This court rejected the buyer's argument that the choice-of-law provision did not extend to the fraud claim, regarding the division between contract and tort as "not sensible." *Id.* at 1047.

> Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid. In this regard, it is also notable that the relationship between contract and tort law regarding the avoidance of contracts on grounds of misrepresentation is an exceedingly complex and unwieldy one, even within the law of single jurisdictions. To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote.

*Id.* at 1048 (footnotes omitted).

This court also reasoned that "[a]s a matter of commercial logic," it made sense "that the Buyer and Seller would choose Delaware law to govern their relations." *Id.* at 1047.

> Although each was physically located in a different New England state and although the Company was headquartered in Ohio, the Buyer and Seller were operating in interstate commerce and wanted a reliable body of law to govern their relationship. They therefore chose the law of the state each had looked to in choosing their juridical home and whose law they wished to have govern their entities. By this means, Buckeyes, Quahogs, and Minutemen could come together using the common language of the Blue Hen, which each embraced as setting forth a reliable and fair set of rules for their commercial relationship.

*Id.* This court saw no reason why the buyer's physical location in Massachusetts meant that the law of that state should override the contractual choice-of-forum provision for purposes of a fraud claim. Although the buyer was located in Massachusetts, the seller was

> physically located in Rhode Island and there is no allegation that the transaction actually was haggled out in the home of the Bean and the Cod. Unlike a car accident case, in which a Rhode Island driver collided with a Massachusetts driver on I–195 in Massachusetts and the Rhode Island driver should have expected to be judged under Massachusetts standards, the physical location of the Buyer in this case has less force as a choice of law factor. The Buyer was a sophisticated private equity buyer operating in interstate commerce. It was a Delaware entity buying a Delaware entity that owned another Delaware entity operating in Ohio from a Seller operating out of Rhode Island.

*Id.* at 1049 (footnote omitted).

The opinion does not suggest that the buyer contended that Massachusetts law should apply because Massachusetts had a fundamental public policy that would have been violated if the court enforced the Delaware choice-of-law provision. The court acknowledged that Massachusetts law was more favorable to the buyer, but the court did

32

not perceive any reason why that balancing of interests should extend to which state's law would govern, when sophisticated parties had entered into a heavily negotiated transaction agreement that chose Delaware law. *Id.* Instead, Delaware had "the greatest interest in having its law applied to this matter." *Id.*

> All of the parties to the Agreement had in common that they were Delaware citizens. Our citizens ought to be able to use our law as a common language for their commercial relationships, particularly when those relationships involve interstate commerce and do not center in any material manner on the geography of any particular party's operational headquarters. Put simply, no state has a materially greater interest than Delaware in applying its law to this matter.

*Id.* at 1049–50.

The *Abry Partners* decision thus involved perhaps the strongest case possible for enforcing a choice-of-law provision selecting Delaware law. All of the parties were sophisticated actors who had crafted a lengthy and detailed acquisition agreement with the assistance of counsel. All of the parties were Delaware entities, and no other state had a strong claim that its law should apply. Although Massachusetts law was relatively more favorable to the buyer for purposes of a fraud claim, Massachusetts had not staked out a particular substantive position supported by a strong policy interest. The *Abry Partners* decision did not involve an employer-employee relationship, the implications of restrictive covenants, or any aspect of labor law.

Citing *Abry Partners*, the *Coface* court held that Delaware would only disregard a choice-of-law provision "in rare circumstances." *Id.* at *3. After recognizing that Coface's state of incorporation was sufficient to establish a substantial relationship between Delaware and the dispute, the court analyzed whether Louisiana had a "'materially greater

33

interest' in the particular issue at hand—determining the effect of the non-compete clause—than Delaware does." *Id.* at \*4. Citing *Abry Partners*, the *Coface* court held that even though Newton was a citizen of Louisiana, signed the asset purchase agreement in Louisiana, and operated his competing business in Louisiana, those geographical contacts did not give Louisiana a materially greater interest than Delaware because Delaware had a "substantial interest in enforcing this voluntarily negotiated contract clause that explicitly designates Delaware law to govern." *Id.*

Having concluded that Louisiana did not have a materially greater interest than Delaware, the court did not reach the question of whether applying Delaware law would be contrary to a fundamental policy in Louisiana. *Id.* Returning to *Abry Partners*, the court quoted that decision as stating that "[t]o enter into a contract under Delaware law and then tell the other contracting party that the contract is unenforceable due to the public policy of another state is neither a position that tugs at the heartstrings of equity nor is it commercially reasonable." *Id.* at \*5 (quoting *Abry Partners*, 891 A.2d at 1050). The court stressed that Newton and Coface had "made a voluntary choice of law to govern their contract" and that this provision would be honored. *Id.*

On its facts, the *Coface* decision reached a logical result. The asset purchase agreement that contained the restrictive covenants governed the sale of a business between sophisticated parties, which necessarily called for placing greater emphasis on the choice-of-law provision to protect bargained-for expectations. That fact also meant that the restrictive covenants in question were tied to the sale of a business, where restrictive covenants are more likely to be upheld. The *Coface* decision also did not involve an

34

irreconcilable conflict between the laws of Delaware and Louisiana. The Louisiana statute did not invalidate restrictive covenants entirely; it permitted them to last for two years from the date of sale. *See* La. R.S. 23:921(B). Although a conflict existed, it was a question of degree rather than one of kind.

Analytically, however, the *Coface* decision can be questioned for its heavy reliance on *Abry Partners*, which did not involve restrictive covenants or a conflict between a fundamental policy of a sister state and Delaware's contractarian regime. *Coface* treated *Abry Partners* as announcing a general rule that a Delaware choice-of-law provision would almost always be dispositive. The *Abry Partners* decision seems better regarded as a careful application of the *Restatement* in a setting where all of the parties were sophisticated, they negotiated at arms' length to choose Delaware law, all of the parties were Delaware entities, and no state other than Delaware had a greater interest in the dispute or a fundamental policy interest at stake. Given its heavy reliance on *Abry Partners*, the *Coface* decision did not give weight to other potentially meaningful factors, such as the place of negotiation, the place of performance, or the location of the subject matter of the contract. *Restatement*, *supra*, § 188. The court also did not weigh the various policies identified in Section 6 of the *Restatement*, nor did it consider the specific application of those policies to contracts for services under Section 196 of the *Restatement*.

In light of the limited scope of the analysis in *Coface* and the reality that the outcome makes sense on the facts presented, the reasoning in *Coface* should be limited to its facts. And that is what the Third Circuit appears to have intended by designating *Coface* as a

35

non-precedential case.[13] The reasoning in *Coface* does not translate to cases involving relationships between Delaware entities and individual employees, as shown by *Ascension* and its progeny.

### iv.  *Sensus USA*

In three decisions, however, the District Court has applied *Coface* broadly, to the exclusion of *Ascension* and its progeny. Focus Parent relies first on *Sensus USA*, a decision that involved a restrictive covenant that bound an individual employee and a true conflict between Georgia and Delaware law. Following *Coface*, the District Court held that Delaware law applied and validated the restrictive covenant.

The plaintiff in that case (Sensus) was a Delaware corporation headquartered in North Carolina. Sensus acquired another company and, as a result, became the employer of Benjamin P. Franklin. *See* 2016 WL 1466488, at *1. Franklin already was bound by an employment agreement that contained restrictive covenants, a Delaware choice-of-law provision, and a Delaware forum provision. *Id.* at *2. After leaving Sensus, Franklin began working for a competitor in Georgia. *Id.* When Sensus sought to enforce his restrictive covenants, Franklin argued that Georgia law should apply because of Georgia's greater

---

[13] The *Coface* opinion on the Third Circuit's website is marked "NOT PRECEDENTIAL." http://www2.ca3.uscourts.gov/opinarch/111482np.pdf (emphasis in original) (accessed on September 16, 2020). *See* 3d Cir. LAR, App. I, IOP 5.7 ("The first page of a not precedential opinion contains a footnote stating: 'This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.'") Non-precedential opinions "appear[] only to have value to the trial court and the parties . . . ." *Id.*

interest in the dispute and because Georgia has a fundamental public policy against restrictive covenants in employment agreements. *Id.* *4.

The court assumed for purposes of analysis that Georgia had a fundamental public policy that prohibited restrictive covenants in employment agreements. *Id.* at *3. Relying heavily on *Coface* and *Abry Partners*, the court held that "Delaware has a substantial interest in enforcing voluntarily negotiated contract clause that explicitly designate Delaware law." *Id.* at *3. It pointed to Sensus' incorporation in Delaware as an important factor in its analysis. *Id.* The court also held that "while geographic contacts with other states may be considered, such contacts alone may be insufficient to demonstrate a materially grater interest." *Id.* The court then stated that

> [w]hile Georgia may have a substantial interest in this dispute, such an interest is not materially greater than that of Delaware. The only ties that implicate Georgia are that Franklin lives there, works from his home there, and signed the contract there. However, Sensus is a national company headquartered in North Carolina and Franklin's sales territory extended beyond Georgia. The parties voluntarily negotiated the contract clause expressly designating Delaware law to govern any disputes. Thus, Franklin's contacts with Georgia do not establish that Georgia possesses a materially greater interest than Delaware in this matter. Delaware has a fundamental interest in allowing its citizens to use its law as a commercial *lingua franca* to transact business across borders.

*Id.* at *4 (citing *Abry P'rs*, 891 A.2d at 1049–50).

Through this analysis, the *Sensus USA* decision extended the non-precedential reasoning of *Coface* from its origins in restricted covenants granted in connection with the sale of a business that only partially conflicted with Louisiana law to the different setting of restrictive covenants appearing in an ordinary employment agreement that wholly conflicted with Georgia law. In doing so, the *Sensus USA* decision further divorced the

37

language of *Abry Partners* from its original context, which involved whether a Delaware choice-of-law provision would govern fraud claims that related to a stock purchase agreement between two private equity companies.

The *Sensus USA* decision did not cite *Ascension*, which this court had issued the previous year. The *Sensus USA* decision also did not engage significantly with the various factors identified by the *Restatement*. The *Sensus USA* decision acknowledged that when Franklin and his employer entered into his employment agreement, the parties knew that Franklin mainly would perform work in Georgia. *Sensus USA*, 2016 WL 1466488, at *1. The commentary to Section 188 of the *Restatement* explains that

> the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power. And a state where a contract provides that a given business practice is to be pursued has an obvious interest in the application of its rule designed to regulate or to deter that business practice.

*Id.* § 188 cmt. a. Another comment to Section 188 adds that "the state where performance is to occur has an obvious interest in the question whether this performance would be illegal." *Id.* cmt. e. "When both parties are to perform in the state," as in an employment relationship, "this state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance." *Id.* Section 196 of the *Restatement*, which governs contracts for personal services, adds that "the place where the major portion of the services is to be rendered, provided that there is such a place, is the contact that will be given the greatest weight in determining, with respect to most issues, the state of the applicable law." *Id.* §

38

196. cmt. b. By contrast, under the *Restatement* test, the fact that Sensus was incorporated in Delaware is the weakest factor for purposes of an employment dispute. *See id.* § 188 cmt. e; *IM2*, 2000 WL 1664168, at \*9 (treating plaintiff's state of incorporation as a relatively weak factor in a *forum non conveniens* analysis). The *Sensus USA* decision nevertheless gave paramount importance to Sensus' incorporation in Delaware. Its abbreviated reasoning, its heavy reliance on *Coface* and *Abry Partners*, and its failure to consider *Ascension*, make *Sensus USA* an unpersuasive decision.

### v. *Advanced Reimbursement*

Next in the *Coface* lineage is *Advanced Reimbursement*. The case involve a quite different procedural posture, which alone makes it an unpersuasive authority for the current case. The case is also factually distinguishable.

The restrictive covenants at issue in *Advanced Reimbursement* were granted in connection with the sale of the business. The plaintiff (Adreima) was a Delaware limited liability company with its principal place of business in Georgia. 2019 WL 2502931 at \*1. The defendants were Clay Plaisance, a resident of Louisiana, and two Louisiana limited liability companies through which Plaisance conducted business. In 2014, Plaisance sold his business to Adreima under an asset purchase agreement and entered into a restrictive covenant agreement, a goodwill purchase agreement, and a consulting agreement with Adreima. The agreements contained Delaware choice-of-law and Delaware choice-of-forum provisions. *Id.* In 2017, Adreima sued Plaisance, alleging that he had formed a new company and was violating his restrictive covenants. *Id.*

Plaisance moved to transfer the action to a federal court in Louisiana, and the District Court granted that motion. The Third Circuit vacated that decision and held that the Delaware choice-of-forum provision provided a basis for the case to proceed in Delaware unless, on remand, the public interest overwhelmingly disfavored the parties' selected forum. *Id.* at *2. The question on remand was whether the District Court should again transfer the case.

One of the factors that the District Court considered on remand was the relative familiarity of the two districts with the applicable state law. The District Court held that Delaware law would apply, resulting in this factor counting against a transfer of the case. *Id.* at *5. In reaching this conclusion, the District Court noted that although Louisiana was the default state, the Third Circuit had held in *Coface* that Louisiana did not have a materially greater interest in the validity of a restrictive covenant. *Id.* The District Court understandably treated *Coface* as dispositive.

In a footnote, the District Court discussed this court's decisions in *Ascension* and *Cabela's*. *Id.* at * 4 n.3. The District Court acknowledged that those decisions "found that a state's specific interest in regulating noncompete provisions is materially greater than Delaware's general interest in freedom of contract," but observed that those cases "do not address *Coface* or the Delaware state jurisprudence on which *Coface* relies." *Id.* The District Court therefore was "not convinced that the Third Circuit's holding in Coface is obsolete." *Id.*

This decision has attempted to fill that void. As explained previously, *Abry Partners* is an influential and important Delaware decision, but it does not establish a universal

40

directive to enforce choice-of-law provisions. The *Abry Partners* decision applied the principles set out in the *Restatement*; it does not override those principles, nor should it be applied to generate results that conflict with the *Restatement*. It is also undesirable to extend *Coface* beyond its facts, consistent with its status as a non-precedential decision.

As with *Coface*, the outcome in *Advanced Reimbursement* makes sense given the posture of the case and the underlying facts. The issue in *Advanced Reimbursement* was not whether to enforce the restrictive covenants, but rather whether the public interest factors overwhelmingly supported transfer, notwithstanding the Third Circuit having vacated an earlier decision transferring the case. The *Advanced Reimbursement* decision also involved restrictive covenants attendant to the sale of a business, and hence at most only a partial conflict with Louisiana law. These differences make *Advanced Reimbursement* an unpersuasive precedent for the current case.

### vi.    *W.R. Berkley*

The *W.R. Berkley* case rounds out the federal foursome. Among those decisions, the facts of *W.R. Berkley* bear the closest resemblance to the facts of this case. The plaintiff (Berkley) was a Delaware entity with its principal place of business in Connecticut. 2019 WL 5457689 at *1. The defendant (Niemela) was a California resident who worked for Berkeley in California. During his employment with a Berkeley subsidiary, Niemela received restricted stock units under agreements that contained non-solicitation covenants and Delaware choice-of-law and choice-of-forum provisions. The agreements also provided that Berkley could repurchase the stock for a nominal price if the non-solicitation

41

covenants were breached. After resigning from his position, Niemela established a competing business, and three Berkeley employees joined his new firm. *Id.*

Berkeley sued to enforce the repurchase provisions in the agreements. Niemela contended in response that California law governed and rendered the non-solicitation covenants void, which eliminated the predicate breach on which Berkeley relied to trigger its repurchase right. The District Court found that "California does not have a clear public policy against enforcement of anti-recruitment covenants." *Id.* at *3. In reaching that outcome, the District Court reasoned that different California decisions had reached different conclusions regarding non-solicitation provisions. *Id.*

The District Court also held that even if California had a clear public policy against non-solicitation provisions, California did not have a materially greater interest in the dispute. After describing the *Coface* decision, the court noted that "Niemela resides in California, signed the agreement in California, and headquartered his competing business in California." *Id.* at *4. The Court also noted that Niemela performed most of his work in California. *Id.* at *1. Nevertheless, relying on *Coface*, the District Court held that "these geographic contacts are insufficient to show that California has a 'materially greater interest' than Delaware when this is not a case between California citizens.'" *Id.* at *4. The court instead found it persuasive that Berkeley was incorporated in Delaware, had its headquarters in Connecticut, and operated throughout the United States. Quoting language from *Sensus USA* that appeared originally in *Abry Partners*, the District Court wrote that Delaware had a "fundamental interest in allowing its citizens to use its law as a commercial lingua franca to transact business across borders." *Id.*

42

In a footnote, the *W.R. Berkeley* decision made passing reference to *Ascension* and its progeny, stating:

> The Court does not find persuasive *Ascension Insurance Holdings, LLC v. Underwood*, where California's specific interest in prohibiting non-compete provisions was materially greater than Delaware's general interest in the sanctity of contract. *Ascension* did not address *Coface* or the Delaware state jurisprudence on which *Coface* relies. In addition, the holding in *Ascension* relied on the fact that all the parties resided in California, whereas here all the parties do not.

*Id* n.3 (internal citations omitted).

Based on extant California law at the time of the *W.R. Berkley* decision, reasonable minds could disagree about whether or not California had a public policy against non-solicitation covenants. In *NuVasive II*, this court held that it did, reasoning that the Supreme Court of California's decision in *Edwards* encompassed both a non-competition covenant and an anti-solicitation covenant. *See NuVasive II*, 2019 WL 4010814, at *4–7. A recent decision from the Supreme Court of California seems to support the analysis in *NuVasive II*. *See Ixchel Pharma,* 470 P.3d at 585 (discussing anti-solicitation covenants in *Edwards* and explaining that under California law, restraints on employment relationships, like noncompetition or non-solicitation agreements, are "per se invalid."). But that is a debatable issue under California law.

The more serious difficulty with *W.R. Berkeley* is its reliance on *Coface*, without acknowledging the factual limitations of that decision, and its invocation of language traceable to *Abry Partners*, which addressed a quite different transaction. At the same time, the decision gave short shrift to the opinions in which this court had written on the interaction between a choice-of-law provision and restrictive covenants in an agreement

43

unconnected to the sale of a business, such as *Ascension*, *Cabela's*, and *NuVasive I and II*. The language of the footnote in *W.R. Berkeley* echoed the District Court's dismissive treatment of *Ascension* and *Cabela's* in *Advanced Reimbursement*.

As this decision has explained, *Coface* is unpersuasive when its reasoning is extended beyond its facts. The expansive reliance on *Abry Partners* is similarly unpersuasive, because that decision did not involve restrictive covenants in an ordinary employer-employee relationship, nor a conflict between Delaware's contractarian framework and a fundamental public policy of a sister state. Relying on *Abry Partners* was defensible in *Coface*, since the latter decision involved restrictive covenants imposed in connection with the sale of a business, so the deal bore a rough resemblance to the heavily negotiated transaction agreement between two private equity firms. But neither *Abry Partners* nor *Coface* engaged in the weighing of interests and competing policies that the *Restatement* calls for when dealing with an agreement governing personal services, like the employment agreements at issue in *W.R. Berkeley* and in this case. Those scenarios require finer-grained analysis, consistent with *Ascension* and its progeny.

Like *Coface* and the other two District Court cases, *W.R. Berkley* is not a persuasive decision for purposes of the claims against Holsopple for breach of the Restrictive Covenants.

### vii. The Choice-Of-Law Conclusion For The Restrictive Covenants

In light of the foregoing analysis, it is highly unlikely that Delaware law governs the Restrictive Covenants. Instead, it is highly likely that California law governs the

44

Restrictive Covenants, meaning that both the claim against Holsopple for breaching those provisions and the claim against Hightower for tortious interference with those provisions will turn on issues of California law. Although it is therefore highly likely that the Restrictive Covenants will be invalid to some extent under Section 16600, questions exist about the extent to which Section 16600 applies to non-solicitation provisions. And questions also exist about the extent to which California law would permit Focus Parent to enforce the Restrictive Covenants outside of California, even though Holsopple performed a majority of his work within California. This case is therefore likely to present significant issues of California law which are of great importance to that state.

b. **Count I: The Claim For Breach Of The Confidentiality Provisions.**

Focus Parent also contends in Count I of the complaint that Holsopple breached the Confidentiality Provisions. This claim remains relevant despite Holsopple's dismissal because Focus Parent relies on it as a predicate for its claim against Hightower for tortious interference with contract. The choice-of-law analysis for this claim is not as clear as for the Restrictive Covenants, and it is possible that Delaware law could apply.

The choice-of-law analysis for the Confidentiality Provisions follows the same path as the analysis of the Restrictive Covenants, until the court assesses whether an actual conflict exists. For purposes of the Confidentiality Provisions, a conflict does not appear to exist at this stage of the case. California law recognizes that businesses have a legitimate

45

interest in protecting their confidential information.[14] Delaware law also recognizes that businesses have a legitimate interest in protecting their confidential information. *Cabela's*, 2018 WL 5309954, at \*10.

At this stage of the proceeding, Delaware law could govern, but only because the parties have not identified any points of disagreement between Delaware law and California law at this preliminary stage. Humans cannot see the future, and it is difficult to predict at the outset all of the issues that may arise as a case unfolds. It remains possible, even likely, that there could be differences in how California law and Delaware law would apply to this dispute.

### c. Count II: Violation Of The Delaware Uniform Trade Secrets Act

In its next cause of action, Focus Parent asserts a claim against Hightower for misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"). It is not reasonably conceivable that DUTSA could apply to this claim. Instead, it is likely that either California or New York law will govern this claim.

Although Focus Parent has attempted to sue under DUTSA, that statute lacks extraterritorial effect. Delaware law presumes that "a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."[15] Therefore, absent clear

---

[14] *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1518 (Ct. App. 1997) (enjoining the misappropriation of confidential information); *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287-88 (Ct. App. 1990) (same).

[15] *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Ward v. CareFusion*

46

legislative intent, it is "impermissible to punish an individual under Delaware law for an action occurring exclusively in another state." *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423, at *2 (Del. Super. Ct. Oct. 21, 1988). DUTSA lacks any indication that the legislature intended for it to apply outside the territorial jurisdiction of Delaware, and Focus Parent has not cited any conduct that took place in Delaware.

Focus Parent suggests that DUTSA could apply because Focus Parent and Focus Sub are Delaware entities. Focus Parent has not cited, and research has not revealed, any decision that uses the state of incorporation of the plaintiff as a controlling, predominant, or even weighty factor when determining what law governs a claim for misappropriation of trade secrets. Under Section 187 of the *Restatement*, the state of incorporation is one factor to consider, but it is rarely mentioned for a trade secrets claim. Courts which use the *Restatement* balancing test typically give the greatest weight to where the misappropriation occurred.[16]

---

*Solutions, LLC*, 2018 WL 1320225, at *2–3 (Del. Super. Mar. 13, 2018) (interpreting California Labor Code as only applying within California); *Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *2 (Del. Super. Oct. 31, 2006) (holding that Delaware Consumer Fraud Act does not have extraterritorial effect); *Carter v. Dep't of Public Safety*, 290 A.2d 652, 655 (Del. Super. 1972) (declining to interpret Delaware statute requiring the forwarding of convictions to the Delaware Division of Motor Vehicles as having extraterritorial effect).

[16] *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) ("The only interest New York has in this case is that Plaintiffs' are incorporated here. We therefore will apply MUTSA instead of the New York common law."); *see also Sarkissian Mason, Inc. v. Enter. Hldgs., Inc.*, 955 F. Supp. 2d 247, 254 (S.D.N.Y. 2013), *aff'd*, 572 F. App'x 19 (2d Cir. 2014) ("Missouri has the greatest interest in this case. Defendant has its principle place of business and its state of incorporation in Missouri,

Under this authority, it is possible that California law could apply. Holsopple primarily worked in California, so any misappropriation could be viewed as having occurred there. In the California Action, Focus Parent asserted a claim for breach of the California Uniform Trade Secret Act, suggesting that Focus Parent agrees that California law could apply, and the California Court has held that Focus Parent has stated a claim on which relief can be granted under that statute. Dkt. 66 Ex. A.

It is also possible that New York law could apply. Focus Parent and Focus Sub had their principal places of business in New York, making it reasonable to infer that the companies developed and held their trade secrets in New York. At oral argument on this motion, Focus Parent seemed adamant that New York had the most significant relationship to the misappropriation, arguing that its trade secrets were developed there, maintained there, and that the effects of that misappropriation were felt there. *See* Dkt. 67 at 59. Yet Focus Parent has not relied on New York law, perhaps because New York has not adopted the Uniform Trade Secret Act. *See Cooney*, 612 N.E.2d at 282.

---

whereas Plaintiffs are Michigan and Delaware corporations with their principal place of business in New York. All sales pitches took place in Missouri. The alleged misappropriation with the roll out of OnRamp occurred in Missouri. Also, the Missouri choice of law clause in the NDA, while not applicable to non-contractual claims, indicates that the parties reasonably expected Missouri law to govern the question of confidentiality between them."); *Cooney v. Osgood Mach., Inc*., 612 N.E.2d 277, 282 (N.Y. 1993) ("Our decision to apply Missouri law rests as well on another factor that should, at times, play a role in choice of law: the protection of reasonable expectations . . .").

At this stage of the case, it is not possible to determine what state's law would govern the trade secret claim. Some authorities would favor California; others would favor New York.[17] One thing is clear: Delaware law does not apply.

### d.     Count V: Tortious Interference With Contract

The next claim at issue is Count V, where Focus Parent contends that Hightower tortiously interfered with the Unit Agreements. Several states have significant interests that relate to this cause of action. New York is where Focus Parent and Focus Sub have their principal places of business, making it likely that some of the events related to this claim took place there. Illinois is where Hightower has its principal place of business, making it likely that some of the events related to this claim took place there. California is the place in which first Focus Sub and later Hightower employed Holsopple, making it likely that many of the events related to this claim took place there. And the provisions in the Unit Agreements that form the predicate for this claim are likely to be governed by California law.

---

[17] *Compare Horne v. Adolph Coors Co.*, 684 F.2d 255, 259 (3d Cir. 1982) (holding that the "fictional situs" of the harm caused by trade secret misappropriation is what determines the governing law, where the "fictional situs" is the residence of the trade secret owner), *and Applied Mats., Inc. v. Adv. Micro-Fabrication Equip., Inc.*, 2008 WL 11398913, at *6 (N.D. Cal. Feb. 29, 2008) ("California law applies where an out-of-state defendant's conduct causes injury in California. . . . This principle is especially true when the injury involves misappropriation of a trade secret because California has a significant interest in protecting the intellectual property of its citizens and businesses from infringement by foreign defendants"), *with BP Chemicals, Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 266-68 (3d Cir. 2000) (applying Taiwanese trade secret law to a dispute between a United Kingdom trade secret owner and a U.S. corporation where the misappropriation occurred in Taiwan).

By contrast, it is not reasonably conceivable that Delaware law could apply. None of the events related to this claim took place in Delaware. The only Delaware connection is that the plaintiff (Focus Parent) is a Delaware LLC, as is the defendant (Hightower). For purposes of a claim for tortious interference, those are weak connections and unlikely to cause Delaware law to apply.

### e. Count VI: Tortious Interference With A Prospective Business Opportunity

In Count VI, Focus Parent alleges that Hightower tortiously interfered with prospective business opportunities by using confidential information that Holsopple provided to lure registered investment advisor firms away from Focus Sub. The jurisdiction with the most significant relationship to this claim is likely to be the situs of the tort, in this case determined by the locations of the poached firms. *See In Travelers 4 Indemnity Co. v. Lake,* 594 A.2d 38, 47 (Del. 1991) ("the local law of the state which 'has the most significant relationship to the occurrence and the parties under the principles stated in § 6 [of the *Restatement*]' will govern the rights of litigants in a tort suit.") (quoting *Restatement*, *supra*, § 145(1)).

A proper determination of the relevant law could prove pivotal for this claim because states vary in the extent to which they recognize the tort of interference with prospective relations. "New York and California are often seen as polar ends of the

spectrum with respect to this action, from the most restrictive to the most lenient, respectively."[18]

Focus Parent already has asserted a similar claim in the California Action, where Focus Parent consistently relied on California law, and the California Court upheld that claim. As with Focus Parent's other claims, there does not appear to be any reason to think that Delaware law would govern this claim. Other than the fact that Focus Parent and Hightower are both Delaware entities, there is no connection between this claim and Delaware. It is not reasonably conceivable that Delaware law could apply.

## 2. Other Considerations Related To The Choice-Of-Law Factor

As demonstrated by the foregoing analysis, it is highly unlikely that Delaware law will govern any of the principal issues in the case. The only issue where it currently appears that Delaware law could apply is the claim for breach of the Confidentiality Provisions, and that is only because the parties have not pointed at the pleading stage to any significant conflicts between California and Delaware law. That does not mean that conflicts between California and Delaware law will not arise as the case progresses. Setting aside this one exception, the law of California permeates this dispute, and this case is likely to raise

---

[18] Deepa Varadarajan, *Tortious Interference and the Law of Contract: The Case for Specific Performance Revisited* 12 Yale. L. J. 735, 741 (2001); *see also* Donald C. Dowling, Jr., *A Contract Theory for a Complex Tort: Limiting Interference with Contract Beyond the Unlawful Means Test,* 40 U. Miami L. Rev. 487, 495 (1986); John Danforth, Note, *Tortious Interference with Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity*, 81 Colum. L. Rev. 1491, 1500-08 (1981).

significant issues under California law. This reality has several consequences for the *forum non conveniens* analysis.

First, Delaware lacks a public policy interest in the outcome of the legal issues presented by this case. *See Nokia Sols.*, 2020 WL 2095829, at \*6 ("[T]he Court is unconvinced by Nokia's argument that the fact that Collision is incorporated here weighs in favor of denying the motion. As noted above, Delaware has no substantial interest in adjudicating this action, unlike an action implicating a Delaware corporation's internal affairs."). California, by contrast, has a significant interest in addressing the issues that appear likely to arise, such as the extent to which the Restrictive Covenants are valid and can be enforced, either in their own right or as a remedy for a breach of the Confidentiality Provisions. This case presents the type of setting where a Delaware court should defer to the courts of a sister state. *See Diedenhofen-Lennartz*, 931 A.2d at 451–52.

Second, the California Court has a comparative advantage over this court in deciding the questions of California law that permeate this dispute. *See TA Instruments-Waters, LLC v. Univ. of Connecticut,* 31 A.3d 1204, 1210 (Del. Ch. 2011). I freely admit that I am not familiar with California law, and I certainly lack the expertise of the California Court. I could, of course, attempt to gather and review California authorities, but even those are more difficult to access, as virtually all of the treatises in my chambers address matters of Delaware law or entity law generally. None address California law. Assuming I could educate myself on the applicable legal principles, I could not apply those principles to the facts with the same juridical *nous* as a California judge.

52

Third, the California legal system as a whole is "better positioned to provide a reliable answer" in this dispute than the Delaware courts. *See Topps*, 924 A.2d at 964. Not only is the California Court better positioned at the trial level, but an appeal in the California Action can eventually reach the Supreme Court of California, which is "the definitive authority on" California law. *Id.* An appeal from this court would go to the Delaware Supreme Court. Our high court is famous for its decisions, but the justices of the Delaware Supreme Court cannot speak authoritatively on matters of California law.

Importantly, the question is not whether this court theoretically could apply California law. As many decisions have recognized, a judge in one state can apply the law of another state.[19] The question instead is whether Hightower should be forced to litigate a case before a Delaware judge when (i) the case is likely to involve many issues of California law of significant importance to California, (ii) there is a California jurist who can address those issue more deftly and with greater nuance, (iii) the principal defendant is no longer a party, (iv) the principal defendant is present in the California Action, and (v) the California Action is more advanced. These considerations weigh heavily in the *forum non conveniens* and counsel in favor of dismissal.

---

[19] *See, e.g.*, *Schmidt v. Washington Newspaper Publ'g Co., LLC*, 2019 WL 4785560, at *9 (Del. Super. Ct. Sept. 30, 2019) ("[T]he [Delaware] Court[s] appl[y] the laws of other states regularly."); *Williams Nat. Gas Co. v. Amoco Prod. Co.*, 1990 WL 13492, at *8 (Del. Ch. Feb. 15, 1990) ("Delaware courts are often called upon to apply the law of sister states").

## C. The Relative Ease Of Access To Proof

The third factor in the *forum non conveniens* analysis evaluates the ease of access to proof. With current technology, the importance of this factor has faded for corporate and commercial disputes.[20] It is not significant here.

Focus Parent argues that all four of the electronic devices that Holsopple used to misappropriate Focus's confidential information are located in New York. Focus Parent also argues that it developed its confidential information and trade secrets in New York, including the information that forms the basis of the trade secrets that Holsopple allegedly misappropriated. Focus Parent correctly observes that Delaware is closer to New York than to California, but in the internet age, that geographical reality is not significant. Holsopple is located in California. Hightower's headquarters are in Illinois. No single jurisdiction will be meaningfully more or less convenient for any of the litigants. This factor does not affect the *forum non conveniens* analysis.

---

[20] *See, e.g., Barrera v. Monsanto Co*, 2016 WL 4938876, at \*6 (Del. Super. Ct. Sept. 13, 2016) (observing that evidence may be transmitted electronically with ease); *Pipal Tech*, 2015 WL 9257869, at \*6 ("[m]odern methods of information transfer render concerns about transmission of documents virtually irrelevant") (internal quotations omitted); *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at \*13 (Del. Ch. Dec. 1, 2009) (noting that parties to Delaware action could collect evidence from other jurisdictions, even where most of the relevant documents and witnesses were in Italy and the Netherlands); *In re IBP, Inc.*, 2001 WL 406292, at \*9 (Del.Ch. Apr. 18, 2001) ("While it is true that Arkansas will be more convenient for Tyson's witnesses, that is not a substantial factor. Depositions can be scheduled in a manner convenient to witnesses, and business travel is expected of top corporate executives . . . .").

54

### D. Compulsory Process

The next *Cryo-Maid* factor asks whether this court can compel the relevant witnesses to appear for discovery and trial. With Holsopple dismissed from the case, the remaining parties are Focus Parent and Hightower. Through its jurisdiction over these entities, this court can "compel production of (i) documents in the entities' possession, custody, or control, (ii) corporate representatives pursuant to Rule 30(b)(6), and (iii) officers, directors, and managing agents of the firms pursuant to Rule 30(a)." *Hamilton P'rs*, 11 A.3d at 1214. At present, those categories likely encompass the majority of the party-related discovery.

Third-party discovery is a different matter. It is highly likely that third-party discovery will be necessary, particularly for Focus Parent's claims involving tortious interference with business advantage. That claim involves at least three registered investment advisors, none of which are located in Delaware. It is possible that some of the advisors may be organized as Delaware entities, which would make them subject to this court's jurisdiction. It is also possible that Hightower may exercise some degree of control over these advisors. Otherwise, this court will not be able to compel the advisors to participate.

For purposes of discovery, this court's inability to issue compulsory process is not fatal, because parties can secure subpoenas through the commission process or by using the Uniform Interstate Depositions and Discovery Act, which Delaware has adopted. *See* 43 *Del. C.* § 4311. The depositions of those witnesses who are not subject to this court's jurisdiction can be used at trial. That outcome is suboptimal, but manageable.

There is also some risk that this court might not be able to compel Holsopple's appearance at trial. As long as Holsopple remains employed by Hightower, then the court can compel Hightower to produce him. This court has encountered situations, however, when the new employer has terminated the disputed employee after discovery revealed that the disputed employee had engaged in questionable conduct. If that were to occur, then this court could not force Holsopple to appear. Because of his central role in the case, that would be problematic.

The California Court faces these issues to a lesser degree. The California Court could compel Holsopple to appear regardless of his employment status, both because he is a party to the California Action and because he is a California resident. The California Court will have the same ability to issue compulsory for witnesses controlled by Focus Parent and Hightower. The California Court also will be able to compel the appearance of third parties located in California.

The potential limitations on this court's ability to issue compulsory process is a factor that weighs in favor of dismissal. It is not dispositive in its own right, nor is it a major consideration, but it contributes to the overall analysis.

## E.     Other Factors Affecting The Administration Of Justice

The final *Cryo-Maid* factor looks to any other matters that would affect the conduct of the litigation and the expeditious and economic administration of justice. *Hamilton P'rs*, 11 A.3d at 1217. This factor "is neither hollow in meaning nor rigid in its application." *Martinez*, 86 A.3d at 1112. It authorizes a trial court to take into account the need to control

its own docket, manage its affairs, achieve the orderly disposition of its business, and promote the efficient use of judicial resources. *Id.*

This case is fundamentally an employment dispute between Focus Sub and Holsopple. During his employment, Holsopple lived in California and performed a majority of his work there. Focus Sub and Holsopple should litigate this case in California under California law. Instead, in an effort to avoid California law and evade the California courts, Focus Sub included various employment-related provisions in its standard-form Unit Agreements, attempted to insulate those provisions from challenge using the Delaware-Law Provisions, and sought to shift any disputes to Delaware through the Delaware-Forum Provisions. Focus Sub then conditioned Holsopple's receipt of substantial portions of his compensation on his signing the standard-form agreements. *See Jurisdiction Decision*, 2020 WL 6266915, at \*23-24 (explaining extent to which a substantial portions of Holsopple's compensation were conditioned on his executing the Unit Agreements).

Through this process, Focus Parent and Focus Sub engaged in forum shopping. They did so prospectively by including provisions in a standard-form agreement, instead of reactively by rushing to court after a dispute arose. But they engaged in forum shopping nonetheless.[21]

---

[21] A key factor is the standard-form nature of the Unit Agreements. Unlike in *Abry Partners*, the paradigmatic case for deference to choice-of-law and choice-of-forum-provisions, the parties in this case did not negotiate freely before agreeing on Delaware law and a Delaware forum. Focus Parent and Focus Sub designed the package of legal rights

"Delaware courts have long discouraged forum shopping." *Kurtin v. KRE, LLC*, 2005 WL 1200188, at \*7 (Del. Ch. May 16, 2005). The effort by Focus Parent and Focus Sub to engage in forum shopping by forcing a California resident to litigate in Delaware is a factor that counsels in favor of dismissal.

There do not appear to be any other considerations that would affect the analysis. Both this court and the California Court have busy dockets, and both courts undoubtedly have felt the effects of the Covid-19 pandemic. The California Action has nevertheless proceeded apace, and it is presently more advanced than this action.

## F. Weighing The Factors As A Whole

When evaluating a motion to dismiss under the doctrine of *forum non conveniens*, this court must evaluate the *Cryo-Maid* factors in their totality to determine whether they weigh heavily and decisively against litigating in this forum. In this case, they do.

The principal considerations that generate this outcome are (i) the predominant role of California law in this dispute, including the need to address important questions that implicate significant public policy issues, (ii) the more advanced stage of California Action, (iii) the dismissal of Holsopple from this lawsuit, and (iv) Holsopple's continued presence in the California action. It would impose overwhelming hardship if Hightower were forced to litigate a less advanced case in this jurisdiction, when Holsopple's absence

---

reflected in the Unit Agreement, presented them in a standard-form agreement, and then conditioned Holsopple's receipt of a substantial portion of his compensation on accepting those terms. *See id.*

makes the litigation more cumbersome, when this court is unfamiliar with the applicable law, and when having two courts address this matter invariably results in the duplication of effort and creates a risk of conflicting rulings.

## III.    CONCLUSION

Hightower has carried its burden to show that it would suffer overwhelming hardship from being forced to litigate this action in Delaware under the circumstances presented. Hightower's motion to dismiss under Rule 12(b)(3) is therefore granted.